Stephen R. Thomas, ISB No. 2326
C. Clayton Gill, ISB No. 4973
Tyler J. Anderson, ISB No. 6632
MOFFATT, THOMAS, BARRETT, ROCK &
        FIELDS, CHARTERED
101 S. Capitol Blvd., 10th Floor
Post Office Box 829
Boise, Idaho  83701
Telephone  (208) 345-2000
Facsimile  (208) 385-5384
srt@moffatt.com
ccg@moffatt.com
tya@moffatt.com
22-054

Attorneys for Defendants Sprint Communications
Company L.P. and Sprint Corporation

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TRUCKSTOP.NET, L.L.C.,<br><br>            Plaintiff,<br><br>vs.<br><br>SPRINT COMMUNICATIONS COMPANY L.P.,<br><br>            Defendant. | Civil No. 04-561-S-BLW<br>(Lead Case)<br><br>**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| TRUCKSTOP.NET, L.L.C.,<br><br>            Plaintiff,<br><br>vs.<br><br>SPRINT CORPORATION,<br><br>            Defendant. | Civil No. 05-138-S-BLW<br>(Consolidated with 04-561) |

**SPRINT'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

<div align="right">Page</div>

I.     INTRODUCTION................................................................................................1

II.    ARGUMENT ....................................................................................................2

    A.    The Contract Is Unambiguous..................................................................2

    B.    Contract Did Not Promise "30dB SNR" or "Best" Signal Coverage.................3

    C.    TSN Misconstrues Sprint's Internal Goal for a 30dB SNR Boundary.............5

    D.    Even If a 30dB SNR Boundary Was a Contractual Requirement, and It Was Not, Sprint Substantially Complied for the Majority of Sites It Installed................................................................................................6

    E.    There are Genuine Issues of Material Fact Regarding Materiality, Substantial Performance, and Causation. ..................................................7

        1.    Materiality of the alleged breach..................................................7

        2.    Substantial performance. ............................................................8

        3.    TSN's experts' opinions which TSN relies upon to attempt to establish a material breach are not admissible. ......................................9

        4.    Even if TSN's expert opinions are admissible, there are still genuine issues of material fact regarding materiality, substantial performance, and causation....................................................10

    F.    Material Breach Letter Silent on "30dB SNR" and "Best" Signal Coverage. ................................................................................................12

        1.    Sprint is entitled to notice and opportunity to cure *all* claimed material breaches under the CSA. ........................................12

        2.    Sprint has a right to cure *all* claimed material breaches under the Uniform Commercial Code.................................................14

III.    CONCLUSION ...............................................................................................21

BOI_MT2:653352.1

## TABLE OF CASES AND AUTHORITIES

**Pages**

**Cases**

*Almena State Bank v. Enfield*,
954 P.2d 724, 24 Kan. App. 2d 834 (1988) ............................................................ 8, 9

*Armco Steel Corp. v. Isaacson Struct. Steel*,
611 P.2d 507 (Alaska 1980)............................................................................... 19, 20

*Bernard v. Las Americas Commc'ns., Inc.*,
84 F.3d 103 (2d Cir. 1996)....................................................................................... 8

*Carson v. Chevron Chem. Co.*,
6 Kan. App. 2d 776, 635 P.2d 1248 (1981) ......................................................... 17, 19

*Convergent Group Corp. v. County of Kent*,
266 F. Supp. 2d 647 (W.D. Mich. 2003) ................................................................ 14

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)................................................................................................ 10

*Decatur County Feed Yd., Inc. v. Fahey*,
266 Kan. 999, 974 P.2d 569 (1999) .......................................................................... 2

*Expansion Pointe Properties, L.P. v. Procopio, Cory, Hargreaves & Savitch, LLP*,
____ Cal. Rptr. 3d ____, 2007 WL 1719932, *9 (Cal. App. 4th Dist. June 15, 2007) ................. 3

*First Nat'l Bank of Hutchison v. Kaiser*,
222 Kan. 274, 564 P.2d 493 (1977) .......................................................................... 2

*Fleet Maint. v. Burke Energy Midwest Corp.*,
11 Kan. App. 2d 523, 728 P.2d 408 (1986) ............................................................. 19

*Howarth v. Oliver*,
52 P.3d 911, 30 Kan. App. 2d 961 (2002) .............................................................. 8, 9

*Imex Int'l, Inc. v. Wires Eng'g*,
261 Ga. App. 329, 583 S.E.2d 117 (2003)............................................................... 16

*In re Cherokee Co. Rev. Bonds*,
262 Kan. 941, 946 P.2d 83 (1997) ............................................................................ 2

*In Re Estate of Johnson*,
202 Kan. 684, 452 P.2d 286 (1969) .......................................................................... 8

BOI_MT2:653352.1

*Kinstler v. RTB South Greeley, Ltd.*,
___ P.3d ___, 2007 WL 1747948, *2 (Wyo. June 19, 2007) ...................................................... 12

*Koppers Co. v. Brunswick Corp.*,
224 Pa. Super. 250, 303 A.2d 32 (1973) ..................................................................................... 16

*Lichnovsky v. Ziebart Int'l Corp.*,
414 Mich. 228, 324 N.W.2d 732 (1982) ..................................................................................... 14

*N.W. Kan. Vocational-Technical Sch. v. Wolf*,
635 P.2d 1268, 6 Kan. App. 2d 817 (1981) ................................................................................... 8

*Oda Nursery, Inc. v. Garcia Tree & Lawn, Inc.*,
103 N.M. 438, 708 P.2d 1039 (1985) .......................................................................................... 16

*Process Research Corp. v. Hyprotech Ltd.*,
2001 WL 34379470, *5 (W.D. Wis. June 14, 2001) .................................................................. 14

*Smith v. Stewart*,
233 Kan. 904 (1983) .................................................................................................................... 20

*Uchitel v. F. R. Tripler & Co.*,
107 Misc. 2d 310, 434 N.Y.S.2d 77 (1980) ................................................................................ 16

*VRT, Inc. v. Dutton-Lainson Co.*,
530 N.W.2d 619, 247 Neb. 845 (1995) .......................................................................................... 9

*Whiteley v. O'Dell*,
219 Kan. 314, 548 P.2d 798 (1976) ............................................................................................... 8

**Statutes**

2007 Kan. Laws ch. 90 (S.B. 308) .............................................................................................. 15

KAN. STAT. ANN. § 84-2-202 ....................................................................................................... 2

KAN. STAT. ANN. § 84-2-508 ........................................................................................... 14, 15, 16

KAN. STAT. ANN. § 84-2-605 ........................................................................................... 14, 15, 16

KAN. STAT. ANN. § 84-2-607 ........................................................................................... 17, 18, 19, 20

**Other Authorities**

U.C.C. art. 2 ................................................................................................................................... 2

BOI_MT2:653352.1

## I.      INTRODUCTION

Plaintiff Truckstop.Net, L.L.C. ("TSN") seeks an order finding as a matter of law Sprint Communications Company L.P. ("Sprint") to be in material breach of contract based upon the term "30dB SNR," when neither "30," "dB" nor "SNR" appear in the contract.  Nor does "best signal coverage" appear in the contract.  Rather, the contract is devoid of any numerical values or "metrics" for performance measurement.  Instead, it provides for testing against a functional standard – whether the user can connect to the Internet.  As to that *express* standard, TSN's instant motion is silent on law and evidence.  To grant summary judgment on an implied term is highly unusual; to grant it on an implied term inconsistent with an express term is utterly devoid of legal precedent.

TSN's motion is further silent on why TSN's notice of material breach letter, dated October 15, 2004, says nothing of  "30dB SNR" or "best signal coverage."  The instant motion also ignores the "material breach" standard quoted from the contract itself in that same October 15 letter:  "Sprint's material failure does not include a <u>failure caused by circumstances not within Sprint's sole control</u>, including, but not limited to, a failure caused by: . . . (b) Customer-provided equipment, or (c) Customer."  (Emphasis added.)   As is apparent from the evidence, to the extent that there was a material problem, which Sprint denies, it must be defined and proved on a hotspot-by-hotspot basis; to the extent there was a systemic material problem, which Sprint denies, TSN must adduce evidence ruling out all causes other than those within Sprint's sole control.  Either way, the resolution of liability in this contract dispute is littered with genuine issues of material fact, so TSN's motion should be denied.

## II.   ARGUMENT

### A.   The Contract Is Unambiguous.

TSN's motion asserts that the "contract at issue is unambiguous."  Motion (CR 198) at 2.  Sprint agrees.  Therefore, much of the evidence attached to the Declaration of Timothy P. Getzoff in Support of Motion for Partial Summary Judgment ("Getzoff Decl.") (CR 199-3) should be stricken or otherwise not considered.  When unambiguous, a contract should be enforced as written, giving the language its natural and reasonable interpretation, and taking care to "constru[e] all provisions together and in harmony rather than in isolation."  *Decatur County Feed Yd., Inc. v. Fahey*, 266 Kan. 999, 1005, 974 P.2d 569, 574 (1999) (quoting *In re Cherokee Co. Rev. Bonds*, 262 Kan. 941, 953, 946 P.2d 83, 91 (1997)).  When a contract is unambiguous, parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract is inadmissible.  *First Nat'l Bank of Hutchison v. Kaiser*, 222 Kan. 274, 277-78, 564 P.2d 493, 496 (1977).  Kansas' adoption of Article 2 of the UCC is consistent.  KAN. STAT. ANN. § 84-2-202 (terms included in contract "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. . . ."); KAN. STAT. ANN. § 84-2-202, Kan. cmt. 2 ("Official Comment 3 to this section states that a writing is completely integrated--and thus extrinsic evidence is inadmissible--if the additional terms 'would certainly have been included' in the document had they been agreed upon.").  Therefore, the contract must be interpreted from the four corners of the Custom Service Agreement ("CSA").  Defendant's Statement of Disputed Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment ("SDF") ¶ 1.[1]

---

[1]  The contract, stipulated to be unambiguous, expressly chooses Kansas law, where Sprint then had its headquarters.  Affidavit of C. Clayton Gill in Support of Motion for Summary Judgment by Sprint Communications Company L.P. ("1st Gill Aff.") Ex. 2 at S066996.  Yet, in its motion

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 2**

**B.      Contract Did Not Promise "30dB SNR" or "Best" Signal Coverage.**

The CSA provides for many things germane to this motion, but it did not promise "30dB

SNR" or "best" signal coverage.  Rather, the CSA provides that the "purpose of the engagement

is to deploy an 802.1x Hot Spot that provides optimal signal coverage to the interior public

seating areas and the exterior commercial parking areas . . . ."  SDF ¶ 2(c).  The contract never

defines "optimal signal coverage."  *Id.* ¶ 2.  Nor do the Institute of Electrical and Engineering

Engineers ("IEEE"), which association defines WiFi standards and protocols, or the American

National Standards Institute define "optimal signal coverage."  *Id.* ¶ 5.

The term "optimal signal coverage" used in the CSA is, however, limited by other

provisions of the CSA that called for fixed prices for each hotspot installation, which further

limited the equipment to be deployed at each site installation depending on the number of

commercial parking areas at which coverage was to be provided.  SDF ¶¶ 2(a) and (b).  The term

"optimal signal coverage"  was further qualified as follows:  "[t]he Wireless Site Survey will

determine the optimal <u>placement</u> of the 2.4GHz <u>antennas</u> in order <u>to provide optimal signal</u>

<u>coverage</u> for the commercial parking areas of each Selected Facility."  *Id.* ¶ 2(d)(i) (emphasis

added).  Because the optimal placement of antennas was subject to things outside of Sprint's sole

control, the parties agreed to a Change Request in August 2004, acknowledging three conditions

precedent and three other conditions subsequent before antenna locations were to be changed or

raised.  *Id.* ¶ 13 (*see, e.g.,* the last condition:  "The truck stop contact does not allow Sprint's

---

TSN acknowledges this choice-of-law provision, but claims to "take[] no position as to
whether . . . [it is] applicable or binding."  Plaintiff's Mem. (CR 199-1) at 5 n.1.  Sprint
disagrees.  Having sued on the contract, admittedly unambiguous, and having failed to proffer
some other body of law as governing in its motion to enforce the contract, TSN has waived,
acquiesced to or otherwise ratified the Kansas choice of law clause.  *See Expansion Pointe
Properties, L.P. v. Procopio, Cory, Hargreaves & Savitch, LLP,* ____ Cal. Rptr. 3d ____, 2007
WL 1719932 (Cal. App. 4th Dist. June 15, 2007).

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 3**

install team to raise the antenna for any reason.  TSN would need to gain approval from the truckstop contact/owner.").

Thus, the phrase "optimal signal coverage" in this context is a limitation, not a grant, given the uncontested premise that each truck stop is unique from a radio frequency standpoint, that a truck stop constitutes a challenging radio environment, and that TSN's sole rights over its customer's truck stop owners are defined by a form contract denominated Property Entry and License Agreement (giving neither TSN or Sprint rights to put antennas wherever Sprint would like).  SDF ¶¶ 12-13 and 1st Gill Aff. Ex. 5.  The term does not guarantee Sprint's obligation to a "platinum" standard, but limits that obligation to a practical and flexible standard.

In fact, the CSA defines the agreed-to performance standard on a functionality basis, i.e., connecting the end user to the Internet.  SDF ¶ 2(d).  The CSA discusses site survey testing by Sprint (Phase 1 of 5) to "determine whether the 802.1x signal can reach the entire perimeter of each Selected Facility with enough signal strength to be used as a network connection to the Internet."  *Id.* ¶ 2(d)(i).  After hotspot design and installation phases, the CSA provides in Phase 5 of 5 for Sprint to do "functionality testing" to demonstrate "access [to] the Internet."  *Id.* ¶ 2(d)(ii).  "Enough strength" for "Internet access" is thus the contractual standard, and says nothing of 30dB SNR as a performance metric as TSN argues.  TSN's instant motion fails to establish that TSN's customers were not able to connect to the Internet when using the TSN hotspots in the intended areas of coverage.  In fact, the evidence is to the contrary.  *Id.* at ¶¶ 15 and 28.

TSN's citation to a dictionary is also improper, as being outside the four corners of the contract.  But even assuming *arguendo* that the Court did consider dictionary definitions of "optimal" and "optimum," those definitions support Sprint's position.  Webster's definition of

"optimal" is "most desirable or satisfactory:  OPTIMUM".  SDF ¶ 4 (capitals in original).  The same dictionary then defines "OPTIMUM" as the "greatest degree attained or attainable under implied or specified conditions."  *Id*. (emphasis added).  Mr. Rysavy explained in deposition that the inclusion of "optimum" within the definition of "optimal" takes him back to "implied or specified conditions," which is why he finds acceptable the definition of "optimal."  Getzoff Decl. Ex. 17; Rysavy 217:07-16; Rysavy Decl. Ex. C at 4-6.  Webster's dictionary shows the two terms as virtually synonymous, having the same Latin root, so a reasonable definition of "optimal" in this context contains the practical limitation of "implied or specified conditions."

Even plaintiff's WiFi expert Geier concedes that practical limitations are inherent in the phrase "optimal signal coverage."  In the Conclusion section of his report, Geier states that an optimal wireless network is one that "offer[s] the highest *possible* SNR values throughout the truckstop *within practical limits*."  Getzoff Decl. Ex. 16 at 19 (emphasis added).  TSN cites Sprint's project manager Jeanette Head, whose definition is consistent.  *See* TSN's SOUF (CR 199-2) ¶ 8 (Head:  OSC is "the best *that can be done . . .*," offering "the highest *possible* SNR values throughout a site *within practical limits*.") (emphasis added).  Clearly, in the context of this dispute, "optimal" is not an absolute value of 30 dB but quite the opposite:  a <u>flexible</u> concept looking toward a <u>functional</u> test of Internet connection, and recognizing certain <u>limiting conditions</u>.  So genuine issues of material fact arise out of (a) those implied or specified conditions, (b) whether they caused a breach, (c) whether the alleged breach was material, and (d) if so, whether the conditions were something within Sprint's sole control.

### C.    TSN Misconstrues Sprint's Internal Goal for a 30dB SNR Boundary.

Notwithstanding the contractual limitations on "optimal signal coverage," Sprint did the best it could under the circumstances to provide 30dB SNR (± 10%) at the perimeter of the

commercial parking areas to which Sprint and TSN agreed to provide coverage.  SDF ¶¶ 6-9.[2] TSN itself concedes that Sprint was hindered in placing antennas in optimal locations because of things outside of Sprint's sole control, e.g., truck stop landowners refusing to provide access or power to locations that Sprint designated as the optimal locations for antenna installations.  *Id.* ¶¶ 12-13; *accord*, 1st Gill Aff. Ex. 17 (Change Request, signed August 23, 2004).

Because Sprint was hindered in its ability to place antennas in optimal locations because of things outside of its sole control, Sprint adopted the 30dB SNR boundary as a goal and not a contractual requirement.  *Id.* ¶¶ 6-9.  Sprint also allowed exceptions to the 30dB SNR goal, giving the installation crews and quality control teams permission to accept boundary readings of 27dB SNR (30dB SNR +/- 3dB) without any further approval, and allowing the installation crews and quality control teams to accept readings below 27dB SNR if a Sprint engineer was able to ascertain that the signal strength was sufficient to allow for Internet connectivity in the outdoor commercial parking areas at which coverage was to be provided.  *Id.* ¶ 8.

There is simply no evidence of a writing signed by Sprint that "required Sprint to design and install WiFi networks that provided an SNR of 30dB throughout the entirety of the outdoor parking lots, as measured when the truck stops were relatively full of trucks," as TSN asserts. Plaintiff's Brief (CR 199-1) at 9.

> **D.  Even If a 30dB SNR Boundary Was a Contractual Requirement, and It Was Not, Sprint Substantially Complied for the Majority of Sites It Installed.**

Sprint provided SNR maps to TSN for the hotspots designed and installed by Sprint. SDF ¶ 9.  The vast majority of those site maps show SNR readings exceeding Sprint's internal goal of 27dB SNR at the perimeter of the outdoor commercial parking areas at which coverage

---

[2]  For the initial site installations, Sprint adopted a 22dB SNR boundary goal.  SDF ¶ 7.  As the installations progressed, Sprint raised the goal to 30dB SNR +/- 3dB SNR.  *Id.* ¶ 8.

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 6**

was to be provided.  *Id.*   Compare this evidence to TSN's evidence, which consists of oral testimony from TSN's expert James Geier, who relies on tests conducted at 74 hotspots months after those sites were abandoned by TSN – 6 of which were not even installed by Sprint and 29 of which Geier did not record his SNR readings. *Id.* ¶ 22.  Sprint's SNR maps show hundreds, if not thousands, of datapoints at or above 30dB SNR; Mr. Geier, by comparison, documented only 59 datapoints for the 74 sites he visited. *Compare* SDF ¶ 9 *with* ¶ 22.

Further, after checking the sites for quality assurance, Sprint engineers were able to connect to the Internet in the intended areas of coverage.  SDF ¶ 28.  Intel also certified TSN's WiFi network in September 2004 after testing a sample of TSN's WiFi hotspots.  *Id.*  Likewise, SiriCOMM, a third party that acquired virtually all of TSN's hotspots in the summer of 2005, also determined that TSN's hotspots, in their "as is" condition when acquired from TSN, provided sufficient signal strength to allow for Internet connectivity in the commercial parking areas.  *Id.*  This evidence, at worst, creates a genuine issue of material fact as to whether Sprint complied with its contractual obligation to provide "enough signal strength to be used as a network connection to the Internet." *Id.* ¶ 2(d).  At best, this evidence justifies entering judgment in favor of Sprint.

> **E.     There are Genuine Issues of Material Fact Regarding Materiality, Substantial Performance, and Causation.**
>
> **1.     Materiality of the alleged breach.**

In its motion, TSN has also ignored the issue of materiality of the alleged breach. Despite quoting, in its material breach letter of October 15, the correct contract provision defining "material failure" as something "not within Sprint's sole control," TSN ignored that test in its instant motion.  Generally, the term "material breach" is discussed most frequently in the context of contract rescission, and here TSN did pray for rescission of the CSA.  *See* Am.

Complaint (CR 25) at 11.  Yet every breach does not give rise to the right to rescind the contract. To warrant rescission, "the breach must be material and the failure to perform so substantial as to defeat the object of the parties in making the agreement."  *N.W. Kan. Vocational-Technical Sch. v. Wolf*, 635 P.2d 1268, 1270, 6 Kan. App. 2d 817, 819 (1981), citing *Whiteley v. O'Dell*, 219 Kan. 314, 316-19, 548 P.2d 798, 800-02 (1976).  An alleged breach going to only part of the consideration, or one that is incidental and subordinate to the main purpose of the contract, is not, in fact, material and therefore does not warrant rescission.  *See In Re Estate of Johnson*, 202 Kan. 684, 691-92, 452 P.2d 286, 293-94 (1969), *accord Whiteley v. O'Dell*, 219 Kan. 314, 316-19, 548 P.2d 798, 800-02 (1976).  Ultimately, to prove the alleged breach was material, TSN must show that the "promisee receives something substantially less or different from that for which he bargained."  *Almena State Bank v. Enfield*, 954 P.2d 724, 727, 24 Kan. App. 2d 834, 838 (1988) (quoting *Bernard v. Las Americas Commc'ns., Inc.*, 84 F.3d 103, 108-09 (2d Cir. 1996)).

### 2. Substantial performance.

To address the question of materiality of an alleged breach, which is necessarily implicated in TSN's motion, TSN has also ignored the doctrine of substantial performance.  *See, e.g., Enfield*, 954 P.2d at 727, 24 Kan. App. 2d at 838-39.  This doctrine includes a presumption of performance under the circumstances, i.e., that the parties are presumed to have impliedly agreed to do what was reasonable, under all of the circumstances, with reference to the matter of performance.  *Howarth v. Oliver*, 52 P.3d 911, 914, 30 Kan. App. 2d 961, 964 (2002). Substantial performance "does not contemplate exact performance of every detail, but rather performance of all important parts."  *Enfield*, 954 P.2d at 724, 24 Kan. App. 2d at 834.  Indeed, substantial performance is the antithesis of material breach.  *Id.* at 838.

The question of whether substantial performance took place is a question of fact to be determined from the circumstances of an individual case.  Substantial performance is shown when the following circumstances are established:

> (1) The party made an honest endeavor in good faith to perform its part of the contract, (2) the results of the endeavor are beneficial to the other party, and (3) such benefits are retained by the other party. . . .  **Substantial performance** is a relative term and whether it exists **is a question of fact to be determined in each case** with reference to the existing facts and circumstances.

*Enfield*, 954 P.2d at 725, 24 Kan. App. 2d at 839, citing *VRT, Inc. v. Dutton-Lainson Co.*, 530 N.W.2d 619, 247 Neb. 845 (1995) (emphasis added); *see also Howarth*, 52 P.3d at 914, 30 Kan. App. 2d at 964.

As will be set forth below (*see* §§ E.3. and E.4., *infra*), and since TSN prays for rescission in its Amended Complaint, TSN has implicated the doctrine of materiality and its reciprocal, substantial performance, both fact-laden questions that are inappropriate for summary judgment.

**3.    TSN's experts' opinions which TSN relies upon to attempt to establish a material breach are not admissible.**

TSN relies upon the opinions of its experts James Geier and Alexander Hills to support its assertion that Sprint failed to deliver 30dB SNR at the perimeter of the intended areas of coverage for almost all of the hotspots installed by Sprint.  However, there are serious questions regarding the admissibility of those opinions.

First, Sprint's expert Peter Rysavy has called into question the scientific methodology employed by James Geier.  SDF ¶ 23; *see also* Sprint's Objection and Motion to Strike Evidence Cited by Plaintiff's Expert James Geier.  More specifically, Rysavy is critical of Geier's failure to record his SNR readings, which prohibits Rysavy or anyone else from testing Geier's results.

Rysavy Decl. at 2-6; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-93 (1993) ("The subject of an expert's testimony must be 'scientific knowledge' . . . .  Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.").  Second, Geier relies upon results from six sites that were not installed by Sprint.  SDF ¶ 22.  Third, because Geier's and Hills' samples were not random, Rysavy and Sprint's statistical expert Dr. Lyman Gallup dispute Geier's and Hills' use of statistics to extrapolate the findings of their selected hotspots to the entire population of hotspots installed by Sprint.  *Id.* ¶ 24.

> **4.      Even if TSN's expert opinions are admissible, there are still genuine issues of material fact regarding materiality, substantial performance, and causation.**

Even if this Court accepts Geier's and Hills' opinions regarding SNR boundary readings, there are still genuine issues of material fact regarding materiality, substantial performance, and causation.  First, Sprint's expert Rysavy points out that Geier arbitrarily classifies sites by grade.  Rysavy Decl. ¶ 8; Geier 125:14-130:14.  For example, if Geier found one reading below 30dB SNR, Geier automatically dropped that site's rating from good to fair.  *Id.*  Surely one reading of 29dB SNR at the perimeter of an intended area of coverage does not amount to a material breach justifying TSN's refusal to pay anything for that site, in addition to recovering $52 million to $85 million in lost profit damages, as TSN is attempting to do in this action.

Second, the parties' experts disagree on the necessity of a 30dB SNR perimeter.  Sprint's expert Rysavy points out that a 30dB boundary is a very conservative figure and that only 10dB SNR is necessary to establish a reliable Internet connection.  SDF ¶ 6.  Both parties' experts agree that 30dB is 100 times stronger than 10dB.  *Id.*  Rysavy also points out that SNR strength is strongest at the access point and weakest at the perimeter, meaning 30dB SNR at the perimeter

generally correlates to a much stronger SNR reading closer to the access point that is broadcasting the radio signal.  *Id.*  For these reasons, Rysavy concludes that "designing an environment for a 20dB SNR value of the perimeter of the network, where presumably the signal is the weakest, would be a prudent approach for reliable coverage."  *Id.*  Finally, Rysavy disputes TSN's experts' opinions that Sprint should have tested for SNR values during peak traffic times. *Id.*[3]

Third, there is substantial evidence that Sprint provided sufficient signal strength for Internet connectivity.  The vast majority of Sprint's SNR maps show SNR readings exceeding Sprint's internal goal of 27dB SNR at the perimeter of the outdoor commercial parking areas at which coverage was to be provided.  SDF ¶ 9.  Further, after checking the sites for quality assurance, Sprint engineers were able to connect to the Internet in the intended areas of coverage. *Id*. ¶ 28.  Third parties Intel and SiriCOMM found the same.  *Id.*  TSN has also admitted three times to this Court that "[t]esting and experience have shown that the system engineered by Sprint is stable . . . when operated in "b" [802.11b] mode. . . ."  *Id.* ¶ 11.[4]  TSN's expert Geier also admitted that the SNR readings in the interior seating areas of each truck stop he tested were sufficient for Internet connectivity, *id.* ¶ 10, which is half of the intended location of use. Finally, TSN presented Sprint with a usage report on August 31, 2004—entitled "June-July [2004] Bandwidth.xls"—that shows at least 483 sites were operable, i.e., moving traffic for TSN's customers.  *Id.* ¶ 15.

---

[3]  TSN's expert Geier could not identify any ANSI or IEEE standard to support his opinion that SNR testing should have been conducted during peak traffic times at each truck stop.  Geier 135:22-136:25, attached as Ex. 6 to 2nd Gill Aff.

[4]  While TSN *asserts* that its network was unstable when operating in the 802.11b/g mode, TSN presents no evidence that Sprint's *alleged* failure to deliver a stable 802.11b/g network was material.

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 11**

Fourth, there is a genuine issue of material fact as to whether things other than signal strength caused TSN's alleged connectivity problems.  Sprint's expert Peter Rysavy and Sprint representative Brandy Snipp have identified at least six (6) other causes of TSN's alleged connectivity problems that were outside of Sprint's sole control.  SDF ¶ 23.  These six other causes of TSN's alleged connectivity problems include:  (1) poor end user education; (2) the TSN network card; (3) TSN and truck stop owners frustrating Sprint's ability to install antennas in optimal locations; (4) competing networks causing interference (*see, e.g.,* TSN's attorney's cease and desist letter to Flying J--2nd Gill Aff. Ex. 16); (5) problems with the controller selected by TSN; and (6) TSN's failure to use available network and monitoring tools to proactively monitor the health of TSN's network.  *Id.*  This alone creates a genuine issue of material fact as to the causation of TSN's alleged connectivity problems.

### F.     Material Breach Letter Silent on "30dB SNR" and "Best" Signal Coverage.

#### 1.     Sprint is entitled to notice and opportunity to cure *all* claimed material breaches under the CSA.

Courts tend to enforce notice-of-breach clauses which contain opportunity-to-cure provisions.  *See, e.g., Kinstler v. RTB South Greeley, Ltd.,* ___ P.3d ___, 2007 WL 1747948 (Wyo. June 19, 2007) ("When a party fails to provide notice of a material breach, if required by the terms of the [contract], reliance on that breach to excuse contractual performance is improper.").  This makes sense as a matter of simple pragmatics and good public policy, encouraging and enabling parties to work out their differences early on and without clogging the courts with yet another lawsuit.  In this case, the CSA contained a material breach section which provided that "[i]f Sprint materially fails to provide Services," then "[TSN] *must* give written notice of the failure and provide Sprint a reasonable opportunity to cure, to be a minimum of 30 days from Sprint's receipt of notice."  SDF ¶ 2(f) (emphasis added).  Notably, this provision is

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 12**                    BOI_MT2:653352.1

not qualified in any way and is therefore not subject to any exceptions.  It provides the exclusive means by which TSN may terminate the CSA, i.e., only after providing Sprint with notice and at least 30 days' opportunity to cure.

Here, TSN invoked the opportunity-to-cure provision, sending a material breach letter to Sprint on October 15, 2004, and quoting this very contract provision, then stating what the alleged material failure was:

> First, Truckstop.net officially declares Sprint in breach of the contract.  In the original contract, Custom Service Agreement BSG034-443R3 point 10 it states:  "Material Failure, if Sprint materially fails to provide Services, Customer may terminate this Agreement.  <u>To terminate for this failure, Customer must give Sprint written notice of the failure and provide Sprint a reasonable opportunity to cure, to be a minimum of 30 days from Sprint's receipt of notice.  If Sprint fails to cure, Customer may terminate the Agreement effective 30 days after giving Sprint written notice of termination due to the material failure.</u>  Sprint's material failure does not include a failure caused by circumstances not within Sprint's sole control, including, but not limited to, a failure caused by: (a) local exchange carrier, (b) Customer-provided equipment, or (c) Customer."  <u>Sprint now has a minimum of 30 days to rectify the material failure.  The material failure is to deliver a stable b/g network as required in Amendments 2 and 3 of the contract.  It is not satisfactory to switch to a 'b' only network for reasons described in my previous communications.</u>

Complaint (CR 1) at Ex. B (emphasis added).  Thus, this crucial and formal letter sent by TSN to Sprint, declaring a material breach and triggering an opportunity to cure the alleged failure, says nothing of "30dB SNR" or "best" signal coverage.  TSN's letter identifies instead  "a stable b/g network" as the material failure, which Sprint allegedly failed to deliver.  Accordingly, by TSN's moving for partial summary judgment on issues <u>not</u> identified in the October 15 material breach letter, TSN both (a) defeats its instant motion, for noncompliance with the unequivocal notice and cure provisions of the contract, and (b) waives its claimed breach on the grounds formally stated in the October 15 letter.  *See Convergent Group Corp. v. County of Kent*, 266 F. Supp. 2d

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 13**

647, 658 (W.D. Mich. 2003) (finding that failure to comply with the express notice and cure requirements under the agreement at issue precluded claim for breach of contract); *Process Research Corp. v. Hyprotech Ltd.,* 2001 WL 34379470 (W.D. Wis. June 14, 2001) ("Because plaintiff did not provide defendant with written notice of these alleged breaches and an opportunity to cure the alleged deficiencies, plaintiff may not terminate the agreement for substantial and material breaches."); *Lichnovsky v. Ziebart Int'l Corp*., 414 Mich. 228, 236-37, 324 N.W.2d 732, 737 (1982) (noting that the inclusion of the right to terminate for cause only upon notice of the breach and an opportunity to remedy the default within 30 days constituted the exclusive means by which the agreement could be terminated, and to hold otherwise would render notice and opportunity to cure provisions "virtually meaningless").

>   **2.      Sprint has a right to cure *all* claimed material breaches under the Uniform Commercial Code.**

No matter whether TSN takes the position that it "accepted" Sprint's tender of the WiFi network sites or "rejected" Sprint's tender of the WiFi network sites, TSN cannot now be heard to complain regarding the claimed defect relating to "30dB SNR" or "best" signal coverage.  As noted above, TSN's October 15 material failure letter addressed ***only*** Sprint's alleged failure to deliver "a stable b/g network" but said nothing of a "30dB" or "best" or "optimal" signal coverage issue.  As a result, TSN has waived any claim of an alleged defect relating to "30dB SNR" or "best" or "optimal" signal coverage.

Under the Uniform Commercial Code, Sprint was also entitled to a right to cure the tender of the WiFi networks at the several sites upon TSN's rejection of the sites.  *See* KAN. STAT. ANN. §§ 84-2-508 and 84-2-605.  Sprint's right to cure is reflected in two operative provisions of the Kansas Uniform Commercial Code ("UCC").  First, the Kansas UCC grants a seller the right to cure upon a buyer's rejection of any tender or delivery of goods, stating:

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 14**

**84-2-508.   Cure by seller of improper tender or delivery; replacement.**

(1) Where any tender or delivery by the seller is rejected because nonconforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

(2) Where the buyer rejects a nonconforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.

*Id.* § 84-2-508.  Moreover, as a consequence to the buyer for the failure to state the basis for its rejection of the goods, the Kansas UCC provides that a buyer has **waived** all objections not presented at the time of rejection of the goods:

**84-2-605.   Waiver of buyer's objections by failure to particularize.**

(1) The buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes the buyer from relying on the unstated defect to justify rejection or to establish breach:

   (a) where the seller could have cured it if stated seasonably; or

   (b) between merchants when the seller has after rejection made a request in writing for a full and final written statement of all defects on which the buyer proposes to rely.

*Id.* § 84-2-605 (2007).[5]  The comments to Kan. Stat. Ann. § 84-2-605 illuminate the importance of a buyer's obligation to state all defects in connection with rejecting goods:

   Where the defect in a tender is one which could have been cured by the seller, a buyer who merely rejects the delivery without stating his objections to it is probably acting in commercial bad faith and seeking to get out of a deal which has become

---
[5]  Section 84-2-605 was amended in 2007 to add three grammatical corrections that do not impact the substance of the provision.  *See* 2007 Kan. Laws ch. 90 (S.B. 308).

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 15**

> unprofitable.  Subsection (1)(a), following the general policy of this Article which looks to preserving the deal wherever possible, therefore insists that the seller's right to correct his tender in such circumstances be protected.

KAN. STAT. ANN. § 84-2-605, Official cmt. 2.

Combining Sprint's right to cure under the express terms of the CSA, as well as under Kan. Stat. Ann. § 84-2-508, upon TSN's rejection of certain sites, together with the consequence under Kan. Stat. Ann. § 84-2-605 of TSN's failure to state all claimed defects with the sites in connection with its October 15 material breach letter, TSN cannot now rely on an unstated defect to establish a breach of the CSA.  A number of authorities so hold.[6]  As set forth above, TSN failed to identify the "30dB" or "best" signal coverage issue in its October 15 letter but, instead, focused on the stability of an 802.11b/g network while conceding the stability of an 802.11b only network.  SDF ¶¶ 11, 16-20.  At no time between the issuance of its October 15 letter and the filing of its motion for partial summary judgment did TSN give notice to Sprint that it claimed a defect in Sprint's alleged failure to deliver "30dB SNR" or "best" signal coverage at the selected sites.  SDF ¶ 20.  As a result, TSN cannot rely in this lawsuit on any claim relating to

---

[6]  *See Imex Int'l, Inc. v. Wires Eng'g*, 261 Ga. App. 329, 335, 583 S.E.2d 117, 123 (2003) (concluding that the failure to particularize the defects so that the seller had an opportunity to remedy and cure timely any defect was a bar to suit.  "Where a curable defect existed, failure to state the defect in the notice of rejection acts as a waiver of such objection, because such failure denies the seller the opportunity to cure such defect."); *Oda Nursery, Inc. v. Garcia Tree & Lawn, Inc.*, 103 N.M. 438, 440, 708 P.2d 1039, 1041 (1985) (concluding that the buyer's failure to state a particular defect in connection with rejection precluded him from relying on the unstated defect to justify rejection or to establish a breach where the seller could have cured the defect); *Uchitel v. F. R. Tripler & Co.*, 107 Misc. 2d 310, 317, 434 N.Y.S.2d 77 (1980) (finding that a garment buyer's failure to particularize defects he complained of, coupled with curable nature of those defects, precluded him from relying on the unstated defects to establish breach of warranty); and *Koppers Co. v. Brunswick Corp.*, 224 Pa. Super. 250, 263, 303 A.2d 32, 39 (1973) (stating where the prime contractor informed the subcontractor of the government's termination of the contract but did not make any statement that the goods supplied by the subcontractor were defective, the omission constituted a waiver of any objection to the goods).

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 16**

"30dB"/"best" signal coverage to justify its rejection of certain sites or to establish a material breach of the CSA.

Additionally, TSN is similarly barred in the event the Court concludes that it accepted Sprint's tender of the several WiFi hotspots.  The Kansas UCC provides that when a buyer has accepted the tender of goods, the buyer must pay the contract rate for the goods accepted and that acceptance of the goods precludes rejection.  *See* KAN. STAT. ANN. §§ 84-2-607(1) and (2). Importantly, "[w]here tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach ***notify*** the seller of breach ***or be barred from any remedy***."  *Id.* § 84-2-607(3)(a)  (emphasis added).   The Kansas Court of Appeals has recognized three general purposes served by this notice requirement:

> First, notice provides the seller a chance to correct any defect. Second, notice affords the seller an opportunity to prepare for negotiation and litigation. Third, notice provides the seller a safeguard against stale claims being asserted after it is too late for the manufacturer or seller to investigate them.

*Carson v. Chevron Chem. Co.*, 6 Kan. App. 2d 776, 784, 635 P.2d 1248, 1255 (1981).

Each of these general purposes applies with great force to the facts presented here.  First, as Sprint has stated above, had TSN provided notice that it claimed the "30dB"/"best" signal coverage issue constituted a breach of the CSA, such notice—which was contractually required under the CSA—would have given Sprint a chance to investigate and correct any such alleged defect which proved to be valid.  Similarly, had TSN provided such notice, it would have afforded Sprint an opportunity to prepare for negotiation and litigation, as opposed to engaging in what has now become a two-and-a-half year exercise in chasing a moving target.  Finally, such notice would have safeguarded Sprint against TSN's stale claim relating to signal coverage, as it is far too late for Sprint to investigate or remedy those recently alleged claims.

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 17**

Notably, several comments in TSN's opening partial summary judgment brief underscore the reasons why Kan. Stat. Ann. § 84-2-607(3)(a) exists in the first place and why TSN must be barred from raising the "30dB"/"best" signal coverage issue at this late date.  For example, TSN boasts that "none of Sprint's experts can refute that these measurements showed poor SNR readings because none of them have ever conducted any tests at any truck stops."  CR 199-1 at 10.  Although the significance of this contention is addressed elsewhere in this brief, Kan. Stat. Ann. § 84-2-607(3)(a) does not allow TSN to pursue its partial summary judgment motion under its "30dB" or "best" signal coverage claim when TSN failed to give notice of such claim to Sprint and deprived Sprint of any ability to investigate or remedy such claim.  Moreover, TSN has indicated that it intends to *continue* to violate the Uniform Commercial Code, noting there are still other claims for breach of the CSA for which it has failed to provide proper notice under Kan. Stat. Ann. § 84-2-607(3)(a).   CR 199 at 4 ("TSN has compiled evidence regarding <u>numerous</u> failings by Sprint.  This Motion, however, focuses on <u>only one</u> material breach . . . .") (emphasis added).   Notwithstanding this self-serving statement designed to cast Sprint in a negative light, TSN cannot pursue any claim for breach that is not articulated in its October 15 material breach letter.

Under the Uniform Commercial Code, after TSN accepted the WiFi networks at truck stop sites, TSN was required to provide Sprint notice of its claims for breach within a reasonable time.  Although the question of timely notice is generally a question of fact, TSN is barred from pursuing any claim for breach as a matter of Kansas law.  Specifically, in concluding that the notice requirement of Kan. Stat. Ann. § 84-2-607(3)(a) is "clear-cut," the Kansas Court of Appeals stated that, under the provision, "Failure to provide a timely notice of defect bars the buyer from ***any remedy***, including the right to revoke and the right to maintain an action for

damages based on [the theories asserted by plaintiffs]." *Fleet Maint. v. Burke Energy Midwest Corp.*, 11 Kan. App. 2d 523, 525, 728 P.2d 408 (1986).  Ultimately, the Kansas Court of Appeals refused to allow a plaintiff to pursue a claim for breach when the record reflected that the seller was not aware of the specific claimed defective condition until after the suit was filed.  *Id.* at 410-11; *see also Carson,* 635 P.2d at 1255, 6 Kan. App. 2d at 783 (construing Kan. Stat. Ann. § 84-2-607(3)(a) as a case of first impression and finding notice unreasonable when seller first received notice of alleged breach upon filing of the lawsuit).

Accordingly, under Kansas law the "reasonable time" period contemplated by Kan. Stat. Ann. § 84-2-607(3)(a) is generally ***before*** the filing of a lawsuit.  *Cf.* KAN. STAT. ANN. § 84-2-607, cmt. 3 ("Notice is less likely to be found timely if given by the filing of the lawsuit or counterclaim.").  In analyzing whether the notice requirement constituted an absolute bar to recovery of damages under the Uniform Commercial Code, the Kansas Supreme Court cited with approval the case of *Armco Steel Corp. v. Isaacson Struct. Steel*, 611 P.2d 507 (Alaska 1980), stating:

> The notice of the breach of warranty that is contemplated by § 2-607(3) does not contemplate the buyer delivering a summons and complaint to the seller as constituting notice.  Section 2-607(3) provides no remedy for a breach of warranty until the buyer has given notice, therefore, summons and complaint cannot constitute notice.
>
> * * *
>
> As a commonsense rule, it must be said that it is not within the spirit of fair play and liberal interpretation to consider the commencement of an action as the giving of notice under the Code.

*Smith v. Stewart*, 233 Kan. 904, 911-12 (1983) (quoting *Armco Steel Corp.*, 611 P.2d at 511-13) (citation omitted).[7]  The Kansas Supreme Court also cited with approval the distinction set forth in *Armco* between commercial cases and cases involving consumers and, specifically, the observation in *Armco* that the notice requirement is strictly construed in commercial cases.  *Id.* at 913; *cf.* KAN. STAT. ANN. § 84-2-607, Kan. cmt. 3 (noting that the Kansas "cases suggest that the 'reasonable time' for giving notice is shorter for a commercial entity rather than for a consumer.").

By operation of Kan. Stat. Ann. § 84-2-607(3)(a) and controlling Kansas case law, because of its failure to give notice of its claims for breach within a reasonable time, TSN has waived its ability to pursue ***any remedy*** for breach, including those listed in its October 15 material breach letter.  TSN is a commercially sophisticated party with backing from well-heeled investors, so this is not a case where the "clear-cut" notice requirement of Kan. Stat. Ann. § 84-2-607(3)(a) should be excepted, excused, or overlooked.  This is especially true where TSN failed to identify its claim of defective signal coverage until the filing of its motion for partial summary judgment, two plus years after the material breach letter of October 2004 and the filing of this action in November 2004.  If the service of a complaint and summons does not constitute timely notice, certainly waiting to give notice of such claim for the first time at the summary judgment stage is undeniably untimely.

---

[7]  In *Stewart*, the Kansas Supreme Court went on to identify exceptions to this general rule that are not applicable here, including relaxation of the notice requirement in personal injury cases. *Id.* at 913-14.

## III.    CONCLUSION

For the foregoing reasons, TSN's motion for partial summary judgment should be denied

in all respects.

DATED this 3rd day of July, 2007.

<div style="margin-left: 40%;">

MOFFATT, THOMAS, BARRETT, ROCK &
FIELDS, CHARTERED


By_____

C. Clayton Gill – Of the Firm
Attorneys for Defendants Sprint
Communications Company L.P. and
Sprint Corporation

</div>

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 21**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of July, 2007, I caused a true and correct copy of the foregoing **SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court using the CM/ECF system, which sent a Notice of Electronic Filing to the following persons:

Steven B. Andersen
Amanda K. Brailsford
HOLLAND & HART, L.L.P.
101 South Capitol Boulevard, Suite 1400
Post Office Box 2527
Boise, Idaho 83701-2527

Timothy P. Getzoff
HOLLAND & HART LLP
1800 Broadway, Suite 300
Boulder, Colorado 80302

_____
C. Clayton Gill

**SPRINT COMMUNICATIONS COMPANY L.P.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 22**      BOI_MT2:653352.1