IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| TRUCKSTOP.NET, L.L.C., | ) | |
| | ) | Case No. CV-04-561-S-BLW |
| Plaintiff, | ) | (Lead Case) |
| | ) | |
| v. | ) | Consolidated with |
| | ) | Case No. CV-05-138-S-BLW |
| SPRINT COMMUNICATIONS | ) | |
| COMPANY, L.P., | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it four motions to strike and a motion to compel.

These motions were originally heard by Judge N. Randy Smith, but before he

rendered a decision, the case was reassigned to this Court.  In addition, the parties

filed cross-motions for summary judgment.  The Court heard oral argument on the

summary judgment motions on January 24, 2008, and took them under advisement.

For the reasons expressed below, the Court shall (1) deny Sprint's motion to

exclude the testimony of James Geier; (2) grant Sprint's motions to strike the

reports of Craig Jamison; (3) grant TSN's motion to strike the Rysavy Declaration;

(4) deny Sprint's motion to strike the Moscrip Affidavit; (5) reserve ruling on the

motion to compel; (6) grant Sprint Communication's motion for summary

**Memorandum Decision and Order – Page 1**

judgment in part, dismissing Counts 2, 3, 4, and 5 from TSN's complaint but denying the motion in all other respects; (7) grant Sprint Corporation's motion for summary judgment and dismiss all claims against it; and (8) deny TSN's motion for partial summary judgment.

The end-result is that this case shall proceed to trial on the remaining claims contained in Counts 1 (breach of contract), 6 (business defamation), and 7 (tortious interference with business relationships). With regard to Count 1, TSN's claim for consequential damages remains in the case to be resolved at trial. These issues will be resolved by the Court sitting without a jury. There will be no follow-on jury trial because all claims against Sprint Corporation have been dismissed.

These rulings are described in more detail below.

## FACTUAL BACKGROUND

TSN provided wireless internet access to its subscribers through access points at truck stops across the United States. The subscribers were typically truck drivers who own laptops and pay TSN a monthly fee.

In 2003, TSN entered into a Customer Service Agreement (CSA) with Sprint Communications. Pursuant to that contract, TSN was to pay Sprint to set up wireless networks at truck stops that would enable TSN subscribers to access the internet.

**Memorandum Decision and Order – Page 2**

TSN alleges that after Sprint installed its system, TSN subscribers complained that they could not connect to the Internet, and many subscribers consequently cancelled their TSN subscriptions.  TSN sued Sprint for breach of contract and other claims to recoup its losses.  This suit will be referred to as *TSN 1*.

TSN also sued Sprint Corporation, the parent of Sprint Communications. TSN alleges that Sprint Corporation tortiously interfered with the contract between TSN and Sprint Communications by directing its subsidiary to breach that contract. This suit will be referred to as *TSN 2*.  Obviously, *TSN 2's* tortious interference claim against Sprint Corporation depends on a finding in *TSN 1* that Sprint Communications breached its contract with TSN.

Sprint denies that its networks are deficient, and filed a counterclaim in *TSN 1* alleging that TSN owes it over $3 million for installing the networks.  Sprint's counterclaim further alleges that TSN has been unjustly enriched by retaining those networks without paying for them.

In *TSN 1*, the parties entered into a stipulation for a bench trial.  In *TSN 2*, TSN requested a jury.  Sprint responded by filing a motion to strike that request, arguing that TSN filed *TSN 2* as a separate action to avoid a jury trial waiver contained in the contract between the parties.

**Memorandum Decision and Order – Page 3**

Before Sprint's motion to strike was resolved, the Court granted a motion to consolidate the cases for all purposes.  In that decision, the Court stated that if the motion to strike was denied – meaning *TSN 1* would be a bench trial and *TSN 2* would be a jury trial – the Court would try the cases sequentially, with *TSN 1* proceeding first.  If TSN prevailed before the Court in *TSN 1*, a jury would then resolve the tortious interference claim in *TSN 2*.  Since that time, Sprint's motion to strike the jury demand has been denied.  Thus the cases will be tried sequentially as discussed above.

## ANALYSIS

### 1.     Motion To Strike Testimony of Expert James Geier

Sprint seeks to strike the expert report and testimony of TSN expert James Geier.  Geier has a master's degree in electrical engineering and 25 years of experience in the "analysis, design, development, installation, and support of numerous wired and wireless network systems for cities, enterprises, airports, retail stores, manufacturing facilities, warehouses, and hospitals throughout the world." *See Geier Report* at p. 1.  His clients include ExxonMobil, the New York Stock Exchange, and the City of Philadelphia.

Geier examined TSN truck stops for signal strength.  He did actual testing at 74 TSN truck stops, and reviewed Sprint design documentation for the remaining

450 TSN truck stops.  On the basis of his analysis, Geier concluded that "Sprint installed a non-optimal wireless network that has signal coverage far below that of wireless networks deployed at similar non-TSN truck stops . . . ."  *See Geier Supplemental Report* at p. 1.  He also concluded that this poor system "was the primary cause" of truckers' complaints that they could not connect to the system, and that the reason for the low signal strength was a "combination of low antenna heights and major obstructions between the antennas and the truck parking area."  *Id*. at p. 19.

In his visits to 74 truck stops, Geier used a software known as "AirMagnet" that measures the signal strength of wireless systems.  Specifically, AirMagnet measures the signal-to-noise ratio (SNR).  Geier concludes that the SNR must be above 30dB for truckers to connect, and stay connected, to the system.  *See Geier Report* at p. 4.

Geier "continuously monitored signal level information as I walked throughout the truck stop parking areas by weaving back and forth approximately every fourth truck along a given row."  *See Geier Declaration* at p. 3.  His AirMagnet software was providing him with continuous SNR readings that would fluctuate on a real-time basis as he walked around.  He would "mentally keep track of the number of parking spaceing [sic] that had acceptable signal coverage . . .

**Memorandum Decision and Order – Page 5**

[and] later calculated the percentage of the truck stop parking area that had signal coverage from the researched data." *Id*.

Using these percentages, he devised a ranking system for each truck stop he visited. A truck stop would earn a ranking of "Good" if 100% of the parking spots had coverage of 30dB or higher; "Fair" if less than 100% (but more than 75%) reached that level; "Poor" if 50%-74% reached that level; and "Very Poor" if the result was less than 50%. *Id*. at p. 24. Of the 74 TSN truck stops he monitored, 71% earned a rating of "Poor" or "Very Poor." *Id*.

His review of the Sprint documentation for the remaining 450 TSN truck stops showed that "approximately 70% of all truck stops have major obstructions [and] . . . [a]s a result . . . would likely also have poor or very poor coverage." *Id*. at p. 8. His final conclusion, based on both his actual visits and his study of the installation documentation was that "90% of the truck stops have poor or very poor coverage." *Id*.

Sprint seeks to exclude Geier's testimony because he selected his 74 truck stops "based on convenience, not a random sample." *See Sprint Brief* at p. 4. Sprint cites to the testimony of its statistical expert, Lyman Gallup, that a random sample is essential "to extrapolate from a sample to the entire universe." *Id*. at p. 5. Along the same lines, Sprint argues that the truck stops are too unique to be treated

**Memorandum Decision and Order – Page 6**

in any uniform manner that would allow extrapolation.

This argument ignores the second basis for Geier's opinions – his study of the Sprint installation documentation for over 450 sites.  Sprint does not challenge this portion of Geier's opinion.  Geier's extensive document review answers Sprint's criticisms that he was making flimsy extrapolations based entirely on his 74 visits.

Sprint asserts next that Geier failed to record the SNR readings he took off the AirMagnet software that led to the percentage figures in his report.  Sprint claims that without Geier's specific SNR measurements, Sprint is precluded from evaluating the accuracy of Geier's percentage figures.

Sprint is correct that Geier did not record discrete SNR values as he walked the parking lots.  Instead, he "mentally" recorded the SNR readings, and then later computed from memory the percentage of the entire site that had coverage over 30dB.  Certainly Sprint may challenge this methodology on cross-examination.  Sprint asserts, however, that it should result in exclusion because Geier's failure to record discrete SNR values at various points in the parking lot renders his results unreliable and makes it impossible for Sprint to evaluate his conclusions.

The Court disagrees.  First, Geier's testified that the "scientific community of wireless engineers would and do measure signal strength over a broad area, not

single spots." *See Geier Declaration* at p. 7.  This is evidence that Geier's methodology is followed by "experts in the particular field."  *See Rule 703.*

Second, Sprint knows Geier's results and his methodology, and so can evaluate their accuracy.  For each of the 74 truck stops he visited, Geier provides the percentage figures he obtained by walking the parking lots, weaving back and forth around every fourth truck along a given row, with AirMagnet's software giving him a continuous feed of fluctuating SNR data.  With this information, Sprint could retrace Geier's steps using the AirMagnet software and compare the percentage figures it arrives at with Geier's percentages.  If the figures are different, Sprint is free to explore this on cross-examination, point out that Geier did not record his SNR values, and argue that its figures should be adopted over Geier's.  Thus, Sprint is not unfairly hampered in its cross-examination by Geier's failure to record discrete SNR values.

For all these reasons, the Court will deny Sprint's motion to exclude Geier's testimony.

**Memorandum Decision and Order – Page 8**

**2.**    **Motion to Strike Jamison Rebuttal Report**

To support both its own motion for partial summary judgment and its response to Sprint's motion for summary judgment, TSN has filed expert rebuttal opinions of Craig Jamison.  TSN submits these reports on issues raised in *TSN 1* and *TSN 2*.  While the cases are consolidated, they have proceeded on different discovery schedules.  Because of this, there were different deadlines in the two cases for the filing of expert rebuttal opinions.  Sprint asserts that TSN has failed to comply with those deadlines in filing Jamison's two reports.  The Court will review those deadlines before resolving Sprint's motion.

In *TSN 1*, TSN's deadline for identifying rebuttal experts was December 12, 2005.  With regard to *TSN 2*, the parties entered into a stipulation, approved by the Court, that extended TSN's rebuttal expert deadline to February 13, 2007.  That stipulation applied only to *TSN 2*.

TSN submitted, on the issues raised in *TSN 2*, two reports of its rebuttal expert Craig Jamison.  Both reports were filed within the stipulated deadline in *TSN 2* of February 13, 2007.  Jamison's first rebuttal report is dated June 2, 2006, and his second was dated on the day of the deadline, February 13, 2007.

Jamison states in his first rebuttal report that he is rebutting the statements of Sprint's expert Andrew Seybold.  He states in his second rebuttal report that he is

**Memorandum Decision and Order – Page 9**

rebutting the statements of Seybold, Peter Rysavy and Carl Ledbetter.

TSN filed a motion for partial summary judgment on the breach of contract claim contained in *TSN 1*, and filed in support, the second rebuttal expert report of Jamison dated February 13, 2007.  Sprint points out that the rebuttal expert deadline in *TSN 1* was December 12, 2005, making Jamison's report late by over a year as to the issues raised in that case.

The Court agrees.  While consolidated for purposes of ensuring consistent verdicts, the two cases have been treated differently for discovery and trial purposes by both the parties and the Court.  The rebuttal expert deadline in *TSN 2* that was extended by stipulation clearly covered only *TSN 2*.  To allow TSN to apply that extension to the issues raised in *TSN 1* would be unfair.  Accordingly, the Court will grant Sprint's motion to exclude Jamison second rebuttal report dated February 13, 2007, from any consideration in TSN's motion for partial summary judgment in *TSN 1*.

Sprint filed another motion to strike after TSN filed both of Jamison's rebuttal reports in opposition to Sprint's motion for summary judgment, that seeks judgment on TSN's tortious interference claim in *TSN 2*.  Jamison's reports are not untimely for consideration in *TSN 2*.  Sprint argues instead that Jamison is unqualified as an expert, pointing out that he is not an electrical engineer and holds

**Memorandum Decision and Order – Page 10**

only a bachelor of arts degree in political science and American history.  Sprint

asserts that his opinions "amount to mere argument of counsel, funneled through a

so-called 'rebuttal expert' . . . ."  *See Sprint Brief* at p. 4.

The Court disagrees.  Jamison offers expert testimony on the wireless

industry based on his 30 years of experience, spent partly in the wireless industry

and partly in closely-related industries.  He co-founded a cellular network company

that controlled FCC licenses for over one million square miles of territory and was

eventually purchased by Blackstone Investments.  Jamison's qualifications

establish his expertise in the wireless industry.  Furthermore, his reports track his

expertise and do not consist merely of "closing arguments."

Sprint's stronger argument is that Jamison's first rebuttal report was

offered to rebut the testimony of Seybold, but Sprint is not relying on Seybold's

testimony in its motion for summary judgment.  Sprint argues that if TSN wanted

to use Jamison for something other than rebuttal, TSN should have filed his expert

report by the initial deadline for experts, which would have allowed Sprint to

obtain rebuttal expert testimony.

The Court agrees.  First, Sprint has not cited Seybold's testimony in its

motion for summary judgment.  Moreover, Sprint is not admitting the gist of

Seybold's testimony through means other than Seybold himself, and thus has not

opened the door by that means.  TSN is therefore using Jamison's rebuttal opinion as a direct opinion, which unfairly precludes Sprint from obtaining expert rebuttal testimony, unless discovery is reopened and the case unduly delayed.  As discussed, that is not an option here. Accordingly, the Court will exclude Jamison's first rebuttal report in resolving Sprint's motion for summary judgment.

Sprint also seeks to exclude any consideration of Jamison's second rebuttal report (dated February 13, 2007) in resolving Sprint's motion for summary judgment.  This report was not only filed to rebut Seybold's opinions but also the opinions of Peter Rysavy and Carl Ledbetter.  Sprint did not use any of these opinions to support its motion for summary judgment.  There is also no evidence or argument that Sprint is using the gist of their testimony without specifically citing to it.

Because Jamison's second rebuttal report was filed to rebut the opinions of Seybold, Rysavy, and Ledbetter, and because Sprint is not using these opinions to support its summary judgment motion, the Court will exclude Jamison's second rebuttal report (dated February 13, 2007) in resolving Sprint's motion for summary judgment.

## 3.   Motion to Exclude Declaration of Peter Rysavy

TSN challenges Peter Rysavy's Declaration submitted by Sprint on June 29,

2007.  Rysavy describes his Declaration as a supplement to his two prior reports that commented on Geier's testing.  In the two prior reports, Rysavy took issue with various aspects of Geier's tests, but never challenged Geier's failure to record discrete SNR values.  Rysavy makes that challenge for the first time in his Declaration filed June 29, 2007.  TSN alleges that the Declaration is essentially a rebuttal expert report that was due under the Scheduling Order on September 29, 2006, making the Declaration eight months late.

Sprint responds that the Declaration is timely under Rule 26(e), that allows supplementation when a "party learns that in some material respect the information [previously] disclosed is incomplete or incorrect."  Sprint argues that it did not know that Geier failed to record discrete SNR values until it received Geier's AirMagnet files, in readable form, on May 21, 2007.  Sprint asserts that it acted promptly by filing, within a month from this discovery, Rysavy's Declaration challenging Geier's failure to record discrete SNR values.

TSN responds that Sprint knew back in 2005 that Geier failed to record discrete SNR values.  TSN points out that in November of 2005, it produced – in response to a Sprint request – all the material that Geier relied upon.  That material revealed that Geier's opinions were not based on recorded, discrete SNR measurements.  TSN asserts that the AirMagnet files revealed nothing new, and

**Memorandum Decision and Order – Page 13**

hence cannot be used to excuse Sprint's failure to file the Rysavy Declaration in a timely manner.

The Court agrees.  TSN's production in November of 2005, established that Geier did not rely on discrete SNR values that he recorded as he walked the parking lots.  Thus, as of that date, Sprint's experts had everything they needed to challenge Geier's opinions on those grounds.  The later production of the AirMagnet files revealed nothing new that Geier relied upon.  This is not a case where a later production puts a new spin on prior submissions.  Here, Geier's lack of SNR values was known by Sprint well-before the filing deadlines for rebuttal expert opinions.  It would be unfair to TSN to allow Sprint to ignore the deadlines for filing new expert rebuttal opinions – and to endure the attendant delays and costs of additional discovery that must accompany such a ruling – at this late stage in litigation that is already over three years old.

The Court will therefore grant TSN's motion to exclude the Rysavy Declaration.

**4.**    **Sprint's Motion to Strike Moscrip Affidavit**

Sprint seeks to strike the"Second Affidavit of Scott Moscrip" filed on August 8, 2007.  Sprint contends that the Moscrip Second Affidavit is a sham, because it contradicts prior judicial admissions by TSN.

**Memorandum Decision and Order – Page 14**

This issue begins with Sprint's filing of its motion for summary judgment, arguing that section 12.2 of the Standard Terms and Conditions for Communications Services (STCCS) precluded any award of consequential damages to TSN.  Section 12.2 contains a clear waiver of the right to seek consequential damages for a breach of the contract.

In response, Moscrip testified in his Affidavit that the STCCS is a separate document from the CSA, and that Sprint had never shown him the STCCS or discussed its applicability.  Moscrip states that "Sprint never provided to me nor advised me of the existence or supposed applicability to the CSA of any separate 'terms and conditions' document such as the STCCS."  *See Moscrip Affidavit* at p. 4.

Sprint argues that TSN has already admitted in this litigation that it was bound by the STCCS.  To allow TSN to now back out of this judicial admission, Sprint asserts, would unfairly penalize Sprint for relying on the judicial admission to forgo costly discovery on the issue.  Sprint asserts that Moscrip's affidavit is a sham because it contradicts TSN's judicial admission.

Admissions in the pleadings and briefs are generally binding on the parties and the Court.  *See American Title Ins. v. Lacelaw Corp,* 861 F.2d 224, 226 (9th Cir. 1988).  "Judicial admissions are formal admissions in the pleadings which

have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Id.* (quotations omitted).  Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them. *Id.*  "Where . . . the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight." *See Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859-60 (9th Cir.1995)

To qualify as a judicial admission, the admission must be "deliberate, clear, and unequivocal." *See Heritage Bank v. Redcom Laboratories, Inc*., 250 F.3d 319, 329 (5th Cir. 2001).  Here, TSN never expressly admitted that it was bound by the STCCS.  Sprint argues, however, that TSN inferred it was so bound by its conduct in (1) attaching the STCCS to its complaint along with the CSR and referring to the attachment as "the contract;" (2) stipulating in *TSN 1* to waive a jury, when the only jury wavier was contained in the STCCS and not the CSR; and (3) arguing that Sprint Corporation was not a third-party beneficiary of the STCCS.

TSN's conduct in attaching the STCCS to its complaint is, at best, ambiguous conduct because the complaint does not expressly assert that the STCCS is binding on TSN or seek to enforce any terms of the STCCS.  While TSN did stipulate to waive a jury in *TSN 1*, the stipulation – filed by the parties – makes

**Memorandum Decision and Order – Page 16**

no reference to the STCCS and contains no admissions that the STCCS is binding on TSN.  Finally, TSN's argument that the Sprint Corporation is not a third-party beneficiary of the STCCS is not inconsistent with the position that TSN is not bound by it.  TSN did not have to concede that the STCCS was binding to argue that Sprint Corporation should not benefit from its provisions.

While each of these instances of conduct, viewed separately, contain no admissions, the conduct taken as a whole would raise a question about TSN's position on the STCCS.  A reasonable litigator in Sprint's position would be compelled to seek clarification.  But conduct requiring elaboration does not constitute a judicial admission – to become an admission, the conduct must be "deliberate, clear, and unequivocal."  *See Heritage Bank,* 250 F.3d at 329.

TSN's conduct never reaches that level.  Any inference raised by the conduct cited by Sprint that TSN was bound by the STCCS was countered pointedly by TSN's consistent pursuit of consequential damages.  TSN made it obvious early-on that it did not consider itself bound by section 12.2 of the STCCS that expressly waived consequential damages.  TSN's position on that issue could only be interpreted as a rejection of the STCCS.  Thus, Sprint cannot claim to be unfairly surprised when Moscrip rejects the STCCS in his affidavits.

Sprint argues, however, that Moscrip has created another reason to deem his

**Memorandum Decision and Order – Page 17**

affidavits a sham.  Moscrip's affidavit references e-mails that contain attachments of contract drafts being exchanged by the parties.  Sprint points out that those attachments include the STCCS.  The dates of these e-mails shows, Sprint argues, that Moscrip received the STCCS long before he says he did, and is further evidence that his affidavits are a sham.  Moscrip explains that the e-mails concerned a different proposal unrelated to the transactions at issue here, giving him no reason to connect the STCCS with this contract.  *See Moscrip Second Affidavit*.

In resolving claims that an affidavit is a sham, the Circuit has stressed the importance of ensuring that "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony."  *See Messick v. Horizon Indus., Inc.*, 62 F.3d 1227, 1231 (9th Cir.1995).  The Court has held above that TSN has not made any judicial admissions that it is bound by the STCCS.  Thus, Moscrip's explanation is not in direct contradiction with a prior judicial admission.  While his credibility may be explored by Sprint in cross-examination, he is entitled to explain his prior testimony under *Messick*, and this Court cannot resolve credibility issues on summary judgment.

For all of the reasons set forth above, the Court finds that TSN has not made any judicial admissions that it is bound by the STCCS, and further finds that the

Moscrip Affidavits are not sham affidavits.

**5.    Motion to Compel**

The Court will take this motion under advisement pending further review.

**SPRINT COMMUNICATION'S SUMMARY JUDGMENT MOTION**

**1.    Consequential Damages**

The central point of Sprint's motion is to block TSN from seeking consequential damages. Sprint points to the clear waiver of those damages contained in the STCCS. TSN responds with Moscrip's testimony that he never received the STCCS, and knew nothing about it, until long after the CSA was signed.

Sprint counters that the STCCS was incorporated by reference in the CSA and thus Moscrip cannot now feign ignorance. On that issue, the CSA states as follows: "For each nonscheduled, non-tariffed Service purchased under this Agreement, Customer must comply with Sprint's [STCCS] . . . which are all incorporated into this Agreement by reference." *See CSA* at p. 4.

The CSA contains no definitions for the terms "nonscheduled" or "non-tariffed." The terms are not used in general discourse and have no commonly-understood meaning. Moscrip states that the terms "were never explained to me, and I have no idea what those are." *See Moscrip Affidavit* at p. 5.

**Memorandum Decision and Order – Page 19**

Looking no further than the four corners of the CSA, the incorporation-by-reference language is ambiguous.  However, the Court can examine extrinsic evidence – "such as expert testimony and learned treatises" – to determine if terms are used as industry-terms-of-art.  *See J.R. Simplot Co. v. Rycair*, 67 P.3d 36, 40 (2003).  Terms unfamiliar to the general public are not necessarily ambiguous if the terms have a commonly accepted meaning in the industry in which the contracting parties work.  *Id*.

While not proffering any "learned treatises," Sprint does proffer the Declaration of Laurie Putthoff to explain the terms.  Under *Simplot*, she must have some expertise that qualifies her to render an opinion on the commonly-accepted meaning that these terms have among persons in the wireless industry.

Putthoff is an in-house attorney with the Sales and Marketing legal department of Sprint/United Management.   She was responsible for Sprint's "custom and practice" of updating, maintaining, and disseminating the STCCS.

Putthoff states that "[a]s a Marketing and Sales attorney within Sprint's in-house law department since 1999, I am also familiar with the different services and products of Sprint . . . and whether they are classified by the [FCC] as nonscheduled, non-tariffed or scheduled (*i.e.*, detariffed)."  *See Putthoff Declaration* at p. 3, ¶ 7.   She goes on to conclude that "WiFi and other wireless

services are considered by the FCC to be 'nonscheduled' and 'non-tariffed' services." *Id*. at p. 4, ¶ 8.

If her testimony is meant to establish that the terms had a common and well-understood meaning in the industry – of which Moscrip should have been aware – she fails in that attempt. No foundation is laid in her affidavit for her expertise in the industry. She is an attorney in marketing and sales, and her affidavit says nothing about her experience in the wireless industry that would qualify her to testify about industry standards. At most, she only establishes what *she* understands the terms to mean, a matter irrelevant to the issues here.

Because the record contains no expert testimony regarding how these terms were commonly understood in the wireless industry, the Court is left with ambiguous terms. Sprint counters that if Moscrip was confused by the terms, he had a duty to understand them before signing the contract. Sprint argues that the law imposes a duty on every contracting party to learn and know the contents of a contract before signing it, and cites *Aero Consulting Corp. v. Cessna Aircraft Co.*, 867 F. Supp. 1480, 1489 (D.Kan. 1994). There, the court held that a contracting party (named Mr. Morales) could not avoid terms in a document (known as Revision A) that was clearly incorporated by reference in a contract just because that document was not physically attached to the contract: "If revision A in fact

**Memorandum Decision and Order – Page 21**

was not attached to the [contract] provided to Mr. Morales, he had a duty to find

out what it contained before he signed a provision making it a part of the contract."

*Id.*

In *Aero*, the attachment was "clearly" incorporated by reference into the

contract, *id*. at 1489, imposing a duty on the contracting parties to hunt it down.

But here, the incorporation was not so clear, as discussed above.  Sprint drafted the

document and hence cannot take advantage of any lack of clarity:  "[T]he reference

to the incorporated document must be clear and unequivocal . . . ."  *See Cariaga v.*

*Local No. 1184 Laborers Intern. Union of America*, 154 F.3d 1072 (9th Cir. 1998)

(applying California law).  The Idaho Supreme Court has quoted this language

from the California courts and pronounced it "sound."  *See Loomis v. Cudahy*, 656

P.2d 1359, 1372 (Id.Sup.Ct. 1982); *see also*,*11 Williston on Contracts*, § 30.25 (4th

ed. 2007) (stating that parties may incorporate documents by reference "[s]o long

as the contract makes clear reference to the document and describes it in such

terms that its identity may be ascertained beyond doubt . . . .").

On the basis of this record, the Court cannot find, as a matter of law, that the

STCCS was clearly incorporated by reference into the CSA, and hence will deny

Sprint's motion for summary judgment on this issue.

**2.**      **Mitigation of Damages**

**Memorandum Decision and Order – Page 22**

Sprint argues next that TSN failed to mitigate its damages.  The Court finds

questions of fact on this issue.  TSN did attempt to reach deals with other groups

such as Wide Area Management Services, Circle Computer Resources, and MCI.

TSN alleges that it could not close these deals because the repairs necessary to

correct Sprint's poor installations were so extensive.  TSN cites to the testimony of

its expert Geier to support its allegation that extensive repairs were needed.  This

record creates issues of fact precluding summary judgment on the mitigation issue.

**3.    <u>Lost Profit Testimony</u>**

Sprint argues that the testimony of TSN's expert, Carlyn Taylor, on lost

profits is too speculative to support a claim for consequential damages.  Taylor's

testimony is based in part on her assumption that investors Loeb and Holmes stood

ready to inject cash into TSN if Sprint would correct its problems.

This assumption, Sprint asserts, is unavailable to Taylor because the Court

has already held that the "alleged willingness [of investors] to invest additional

money into TSN cannot be considered because it is too speculative."  *See Sprint*

*Brief* at p. 14.  The Court never so held.  In its prior decision, the Court was

evaluating Sprint's argument that it should be allowed to pierce TSN's LLC veil

because investors Lev and Holmes would co-mingle their own funds with TSN's

assets, thereby ignoring the separate nature of the LLC.  The Court held that Sprint

**Memorandum Decision and Order – Page 23**

produced no evidence that such co-mingling occurred, was planned, or would be the inevitable result of any investment by Lev and Holmes.  Accordingly, the Court deemed *Sprint's* theory as speculation, not TSN's theory.

Sprint argues next that Taylor failed to take into account the failure of competitors like Siricomm to make a profit.  There are, however, questions of fact concerning whether Siricomm's business is sufficiently similar to TSN's to warrant such a comparison.  The testimony of Kory Dillman, Siricomm's Rule 30(b)(6) designee, highlighted the differences in the business operations between the two companies and creates issues of fact that preclude summary judgment.

For all of these reasons, the Court finds that Taylor's testimony on lost profits is not, as a matter of law, too speculative.

### 4.    <u>Tort Causes of Action – Counts 2 through 5</u>

Sprint seeks next to dismiss TSN's tort causes of action.  TSN has alleged claims of negligence, negligent misrepresentation, fraud in the inducement, and fraud and fraudulent concealment.

The Court agrees with Sprint that TSN's tort claims all arise out of the alleged violation of duties created by contract, and hence must be dismissed.  *See Taylor v. Herbold*, 483 P.2d 664, 669 (Id.Sup.Ct. 1971).  In addition, TSN has not produced evidence for many of these claims.

**Memorandum Decision and Order – Page 24**

For example, TSN fraudulent inducement claim is that Sprint induced TSN into entering the contract by falsely representing that its "five-phase Hot Spot deployment methodology" was in existence when in fact it did not exist, and Sprint was aware that it did not exist.  TSN relies heavily on the testimony of Craig Jamison to support these assertions, but the Court has held above that his testimony must be excluded.

Another piece of evidence cited by TSN to support this claim is an e-mail from Gerry Cockram dated February 10, 2004, about eight months after the CSA was signed.  That same evidence, and argument, is used by TSN to support its breach of contract claim, and hence is not evidence of a separate tort.

TSN also cites testimony from Brandy Snipp, a Sprint manager, that in October of 2003 – about three months after the CSA was signed – Sprint did not have adequate equipment, personnel or time to properly install or test equipment at TSN venues.  Once again, this occurred after the contract was signed and is part of TSN's contract claims, not a separate tort action.

Finally, TSN cites a "Testing Report" and a "Proxim Letter" that allegedly contained false statements.  These documents were both created in October 2004, more than a year after the CSA was signed, and almost a year after even the Third Amendment was signed.  There is no evidence that they contributed to any fraud in

the inducement.

To support its claim of fraudulent concealment, TSN cites to contract language, which allegedly implies that Sprint's "Hotspot Deployment Methodology" was already in existence (when the CSA was signed), a false implication.  TSN cites to no authority holding that a fraudulent concealment claim based on contractual language is sufficiently separate from the contract claim to exist as a separate tort.

Moreover, TSN is seeking recovery purely for its economic loss.  Unless an exception applies, the economic loss rule prohibits recovery of purely economic losses in a negligence action because there is no duty to prevent economic loss to another.  *Duffin v. Idaho Crop Improvement Ass'n*., 126 Idaho 1002, 1007, 895 P.2d 1195, 1200 (1995).

TSN argues that an exception applies due to the special relationship between TSN and Sprint.  A special relationship may be established when a professional or quasi-professional performs personal services for a lay person, or when an entity holds itself out as having expertise in a specialized function and, by so doing, knowingly induced TSN to rely on that expertise.  *See Blahd v. Richard B. Smith*, 108 P.3d 996 (Id.Sup.Ct. 2005).

Under either scenario, a special relationship has been applied only to "an

**Memorandum Decision and Order – Page 26**

extremely limited group" where it would be "equitable to impose such a duty." *Id*.
Here TSN and Sprint are both sophisticated commercial entities represented by
counsel.  The equities do not demand the application of the doctrine.  The Idaho
courts, if confronted with the issue, would not extend this doctrine – intended to be
applied only in an "extremely limited group of cases" – to the circumstances here.

For all these reasons, the tort claims in Counts 2 through 5 shall be
dismissed.

## 5.   Business Defamation & Tortious Interference with Business Relationships – Counts 6 & 7

In these counts, TSN alleges that Gerry Cockram posted false statements on
the Internet while impersonating TSN Vice-President Allan Meiusi.  In his
postings, Cockram, impersonating Meiusi, blamed TSN subscribers for not having
the intelligence to connect to the Internet, and asserted that TSN failed to record
enough information to determine connectivity problems.  Sprint has admitted that
the messages were posted on the Internet and that Cockram posted them.

At his deposition, Cockram was asked (1) if he posted those messages; (2) if
the postings were intended to help Sprint; and (3) whether officials from Sprint
Communications or Sprint Corporation provided him with information included in
the false postings.  Cockram invoked the Fifth Amendment to each question and

refused to answer.

In seeking summary judgment on these claims, Sprint argues first that Cockram worked for Sprint United Management Company (Sprint UMC), not Sprint Communications.  While Cockram's paycheck did come from Sprint UMC, he testified that he worked for Sprint Paranet, Sprint Global Markets Group, and Sprint Business Solutions during his employment for Sprint.

With regard to this last group – Sprint Business Solutions – Deborah Neal testified that although she was paid by Sprint UMC, "Sprint Business is part of Sprint Communications . . . ."  *See Neal Deposition* at p. 223-24.  This testimony at least raises questions of fact on the issue of whether Cockram worked for Sprint Communications.

Sprint argues that Cockram's conduct was personal in nature and had nothing to do with assisting Sprint.  However, Cockram invoked the Fifth Amendment when asked if he was acting on behalf of Sprint, and thus the Court may draw an adverse inference that he was so acting.  *See SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998).

For these reasons, the Court will deny Sprint's motion for summary judgment on these claims.  TSN seeks summary judgment that Cockram worked for Sprint Communications.  The same questions of fact preclude summary

**Memorandum Decision and Order – Page 28**

judgment on this issue as well.

6.   **Summary of Rulings on Sprint Communication's Motion for Summary Judgment**

In summary, the Court will grant Sprint's motion to the extent it seeks summary judgment on Counts 2, 3, 4, and 5, but will deny it in all other respects.

## SPRINT CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Sprint Corporation seeks summary judgment on the claim that it is liable for interfering in the contractual relationship entered into by its subsidiary, Sprint Communications.  In an earlier decision on Sprint's motion to dismiss, the Court refused to adopt the authority cited by Sprint that a parent company, by law, has the right to interfere in the contracts of its wholly-owned subsidiaries.

Sprint urges this Court to reconsider that decision.  The Court finds persuasive reasons to reverse course.

The first and foremost reason is the uniform holding of courts across the country that a parent corporation has a privilege to interfere with the contracts of its wholly-owned subsidiary when the contract threatens a present economic interest of that subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose.  *See e.g., Boulevard Associates v. Sovereign Hotels, Inc*., 72 F.3d 1029, 1036 (2d Cir.1995);  *Deauville Corp. v. Federated Department Stores*, 756 F.2d 1183, 1196-97 (5th Cir.1985);  *Canderm*

**Memorandum Decision and Order – Page 29**

*Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988).

The Court finds the reasoning of these cases persuasive.  TSN is unable to cite a single case to the contrary.  TSN does argue, however, that the Ruth West letter at least creates an issue of fact over whether Sprint Corporation employed wrongful means to terminate TSN.  More specifically, TSN alleges that Ruth West's letter on behalf of Sprint Corporation contained numerous false statements designed to unfairly intimidate TSN.

TSN has not cited any evidence, however, that Ruth West was employed by Sprint Corporation.  She states in her Declaration that she is employed by Sprint Communications.  *See West Declaration* at ¶ 2.  TSN cites nothing to indicate otherwise.  Thus, TSN cannot use her letter to establish Sprint Corporation's wrongful conduct.

For all these reasons, the Court will grant Sprint Corporation's motion for summary judgment and order that *TSN II* be dismissed.

## TSN's MOTION FOR PARTIAL SUMMARY JUDGMENT

TSN seeks a partial summary judgment that Sprint failed to provide optimal signal coverage.  TSN asserts that this term can only mean that Sprint agreed to provide an SNR of 30dB throughout the entirety of the outdoor parking lots, and that they failed to do so, as established by TSN's expert Jim Geier.  There are, however, questions over the definition of "optimal" and the coverage actually provided by Sprint that preclude a summary judgment for TSN.  Accordingly, TSN's motion will be denied.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that Sprint's Objection and Motion to Strike Evidence Cited by Plaintiff's Expert James Geier (Docket No. 212) is DENIED.

IT IS FURTHER ORDERED, that Sprint's Motion to Strike Craig Jamison's Rebuttal Report (Docket no. 213) is GRANTED, and Jamison's Second Rebuttal Report dated February 13, 2007, is excluded from any consideration in TSN's motion for partial summary judgment in *TSN 1*.

IT IS FURTHER ORDERED, that Sprint's supplemental motion to strike Craig Jamison's report (Docket No. 234) is GRANTED and Jamison's rebuttal

expert reports dated June 2, 2006, and February 13, 2007, are excluded from any

consideration in Sprint's motion for summary judgment in *TSN 2*.

IT IS FURTHER ORDERED, that TSN's motion to strike declaration of

Rysavy (Docket No. 230) is GRANTED.

IT IS FURTHER ORDERED, that Sprint's Motion to Strike Second

Affidavit of Scott Moscrip in Opposition to Sprint's Motion for Summary

Judgment (Docket No. 256) is DENIED.

IT IS FURTHER ORDERED, that Sprint Communication's motion for

summary judgment (Docket No. 195) is GRANTED IN PART AND DENIED IN

PART.  It is granted to the extent it seeks to dismiss Counts 2, 3, 4, and 5.  It is

denied in all further respects.

IT IS FURTHER ORDERED, that Sprint Corporation's motion for summary

judgment (Docket No. 193) is GRANTED, and all claims against Sprint

Corporation shall be dismissed.

IT IS FURTHER ORDERED, that TSN's motion for partial summary

judgment (Docket No. 198) is DENIED.

IT IS FURTHER ORDERED, that counsel shall contact the Deputy Clerk

LaDonna Garcia at (208) 334-9021 to set a trial date.



DATED:  **February 1, 2008**

Honorable B. Lynn Winmill
Chief U. S. District Judge